**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSE NIEVES | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:15-cv-01842 (JCH) |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | DECEMBER 30, 2016 |
| Defendant. | : | |
| | : | |

**RULING RE: CROSS MOTIONS TO REVERSE (DOC. NO. 17) AND AFFIRM**
**(DOC. NO. 20) THE DECISION OF THE COMMISSIONER OF SOCIAL SECURITY**

## I.   INTRODUCTION

Plaintiff Jose Nieves ("Nieves") has filed this action pursuant to section 405(g) of

title 42 of the United States Code, seeking an Order reversing the final decision of the

Commissioner of Social Security, defendant Carolyn Colvin ("Colvin"), that Nieves is not

entitled to Supplemental Security Income ("SSI") under Title XVI of the Social Security

Act and Social Security Disability (DIB) benefits under Title II of the Social Security Act.

See Mot. to Reverse the Decision of the Commissioner (Doc. No. 17).  Colvin has filed

a cross Motion in which she asks the court to affirm the final decision denying Nieves

benefits.  See Def.'s Mot. to Affirm the Decision of the Commissioner (Doc. No. 20).

For the reasons that follow, the decision of the Administrative Law Judge is

reversed and remanded in order to more fully consider whether Nieves has a listed

impairment and take into account the opinions of his treating physicians.

## II.   BACKGROUND

Nieves was born on December 16, 1978, and was 33 years old on the alleged

onset date of his disability, August 1, 2012.  See Certified Tr. of the Record ("Tr.") at 20

(Doc. No. 13).  Nieves has been suffering from a seizure disorder, subject to both grand mal, or general tonic clonic seizures and myoclonic jerks since at least age 19.  Id. at 346.  For most of his adult life, Nieves was employed: first as a fork-lift driver and then, as his disease progressed and prevented him from working with machinery, a sub-assembly person.  Id. at 45-46.  His employer made substantial accommodations, including building a nurse's station where he could recover from a seizure.  Id. at 56. Unfortunately, he was let go due to his employer relocating to Japan.  Id.

Nieves applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on August 17, 2012.  His application was initially denied on March 6, 2013, Id. at 114, and was denied again after reconsideration on July 17, 2013. Id. at 121, 128.  Nieves requested a hearing before an Administrative Law Judge ("ALJ") on August 16, 2013.  Id. at 135.

ALJ Lisa Groeneveld-Meijer of the Office of Disability Adjudication and Review of the Social Security Administration held a hearing on Nieves' application for benefits in New Haven, Connecticut on June 16, 2014.  Id. at 37.  Nieves, who was represented by counsel, testified at that hearing.  Id. at 43.  Additionally, Richard Hall, a vocational expert, testified as to Nieves' Residual Functional Capacity ("RFC").  Id. at 64.  For the ALJ's consideration, Nieves submitted medical records from Associated Neurologists of Southern Connecticut, the practice of Nieves' primary physician, Anthony Quan Hong, M.D. ("Dr. Quan Hong"), as well as Bridgeport Hospital, and Yale New Haven Hospital, his current healthcare provider.  See Id. at 344, 427, 707.  These records document Nieves' history of seizures from 1999 through present.  See Id.

Collectively, these records indicate steadily worsening epileptic seizures and considerable requests for accommodation from Nieves ex-employer.  By November 25, 2003, Mr. Nieves was diagnosed with epilepsy by his physician, Dr. Quan Hong.  Id. at 250.  An MRI scan indicated that Multiple Sclerosis was also a potential diagnosis.  Id. at 253.  However, the result of a lumbar puncture disproved that diagnosis.  Id. at 641, 645.  As he continued to seek treatment, Dr. Quan Hong recommended that Nieves work with his employer to accommodate his seizures and his recovery from them.  See, e.g., id. at 537 (A letter, dated October 9, 2009, from Dr. Quan Hong informing Nieves' employer that, "[u]nfortunately, because of his medical conditions, at times he may be late and at other times he may need to miss work completely.").  By December 3, 2010, Dr. Quan Hong determined that Nieves' permanent epilepsy would cause him to miss work between one and eight times per month.  Id. at 554-55.  Dr. Quan Hong revised this estimate to one to eight times a year in his "Certification of Health Care Provider for Employee Serious Health Condition (Family and Medical Leave Act)" on June 1, 2012.  Id. at 569.

A more recent doctor's visit with a new physician at Yale New Haven Hospital on April 18, 2014, concluded that Nieves suffers from myoclonic jerks four to five times per week, and general tonic clonic seizures between two to three times per month, while on a dose of 300 mg of lamictol per day.  Id. at 729.  This frequency improved over the next two months, such that there was only one general tonic clonic seizure per month between April and May, 2014.  Id. at 736.

In addition, the Record contains notes from three consulting doctors.  More specifically, Edward Layne, M.D. ("Dr. Layne") conducted a case record analysis and

analyzed Nieves' RFC on June 11, 2013. Id. at 93, 95. Dr. Layne reviewed Dr. Quan Hong's records and determined that the Nieves' claims that he had epilepsy were "partially credible," and instead diagnosed the claimant with a seizure disorder and multiple sclerosis. Id. at 93. This opinion was given great weight by the ALJ in determining Nieves' RFC, because it was "supported by the clinical and laboratory data . . . and it [was] not inconsistent with other significant evidence of record." Id. at 28.

Additionally, Robert Sutton, Ph.D. ("Dr. Sutton") performed a Medically Determinable Impairments and Severity review on July 17, 2013. Id. at 94. He determined that Nieves had four severe impairments: epilepsy, multiple sclerosis, organic brain syndrome, and affective disorders. Id. 94. This opinion was also given great weight by the ALJ in determining Nieves' impairment. Id. at 24.

Finally, Melissa Antiaris, Psy.D. ("Dr. Antiaris") performed a psychological evaluation of Nieves on July 8, 2013. Id. at 515. This psychological review determined that Nieves has an adjustment disorder with mixed anxiety and depressed mood, as well as epilepsy, sleep apnea, dormant multiple sclerosis, high blood pressure, and weight gain. Id. at 518. Despite these multiple disorders, Dr. Antiaris determined that Nieves was cooperative, related adequately, and could largely function on his own. Id. at 515-16. This opinion was also given great weight by the ALJ in determining Nieves' impairment. Id. at 24.

On August 26, 2014, ALJ Groeneveld-Meijer issued a decision denying Nieves' DIB and SSI claims. Id. at 30. In particular, the ALJ applied the familiar five-step sequential test for determining disability and made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.      Nieves has not engaged in substantial gainful activity since the alleged onset date of August 1, 2012;

3.      Nieves has the severe impairment of epilepsy;

4.      Nieves  "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1";

5.      Nieves has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he cannot climb ladders, ropes or scaffolds and must avoid even moderate exposure to potential hazards, moving machinery, and unprotected heights.  He must avoid concentrated exposure to fumes, odors, dusts, gases, poorly ventilated areas and extreme temperatures, but can perform work that is routine day-to-day with few changes;

6.      Nieves is unable to perform any past relevant work;

7.      Nieves has at least a high school education and is able to communicate in English;

8.      Transferability of job skills was not material to the disability determination because he is "not disable" under the Medial-Vocational Rules; and

9.      "Considering [Nieves'] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Nieves] can perform . . . ."

Id. at 23-29.  On the basis of these findings, ALJ Groeneveld-Meijer found that Nieves was not under a disability from August 1, 2012 through August 26, 2014.  Id, at 30.

Nieves timely requested review of ALJ Groeneveld-Meijer's decision by the Appeals Council.  See id. at 14.  The Appeals Council denied Nieves' request for review on October 23, 2015, on the grounds that the Appeals Council "found no reason under [their] rules to review the Administrative Law Judge's decision."  Id. at 1.  Thus, the ALJ's decision became the final decision of Colvin in her capacity as Commissioner of Social Security.  See Lesterhuis v. Colvin, 805 F.3d 83, 87 (2d Cir. 2015) ("If the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision.").  Nieves timely challenged Colvin's decision to deny his DIB and SSI benefits by way of a Complaint initiating this action on December 21, 2015.  See Compl. (Doc. No. 1).  The pending Motions followed, and the issues were joined before this court on October 28, 2016.

## III.   LEGAL STANDARD

In reviewing a Social Security disability determination, a court will set aside the decision of an ALJ "only where it is based upon legal error or is not supported by substantial evidence."  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  As the Supreme Court has instructed, "substantial evidence . . . [is] more than a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotations and citation omitted).  Rather, substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  Further, the substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998).

6

Under this standard of review, absent an error of law, a court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the court might have ruled differently.  See Eastman v. Barnhart, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).  In other words, "[w]here an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner."  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).

## IV.   DISCUSSION

For the purposes of both SSI and DIB, a person is disable when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  Claims under the Social Security Act are considered using a standard sequential five-step analysis:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schwieker, 675 F.2d 464, 467 (2d Cir. 1982)).  Importantly, if the claimant does have a listed impairment, the inquiry ends and the claimant is disabled despite any RFC to work.  Id.

Nieves raises five claims of error in his pending motion:

1.  Nieves has a listed impairment, and therefore he is disabled;

2.  The ALJ failed to properly follow the treating physician rule and substituted her opinion for that of Nieves' Doctors;

3.  The ALJ did not properly evaluate the duration, persistence, location, and severity of Nieves' pain;

4.  The ALJ failed to properly determine Nieves' RFC; and

5.  The defendant has failed to meet her burden of proof that there are substantial number of jobs available in the national or regional economy that Nieves could perform.

Mem. in Supp. of Pl.'s Mot. for an Order Reversing the Decision of the Commissioner or in the Alternative Mot. for Remand for a Rehearing ("Pl.'s Mem.") at 9-18 (Doc. No. 17-1).  For the reasons below, the court concludes that Nieves' first and second claimed errors entitle him to relief in the form of a remand for further proceedings consistent with this Ruling, and therefore does not reach the question of whether Nieves is entitled to relief on his other claims.

1.  <u>The ALJ Failed to Explain Why Nieves does not have a Listed Impairment</u>

Nieves' first argument is that ALJ Groeneveld-Meijer did not accurately consider his symptoms when she determined that it was not a listed impairment under section 404, subpart P, Appendix 1 of title 20 of the Code of Federal Regulations.  Id. at 9. Specifically, Nieves argues that the medical record contains sufficient medical evidence

of all of the signs and symptoms to meet the listing of epilepsy in sections 11.02 and

11.03.[1] Id. at 9-10.  Colvin responds by arguing that Nieves does not meet the listing

because he does not have a detailed description of a typical seizure pattern with all

associated phenomena.  Def.'s Mem. of Law in Supp. of her Mot. for an Order Affirming

the Decision of the Commissioner ("Def.'s Mem.") at 4.  Colvin argues that the record

does not show that Nieves' seizures has each and every description described in

11.00A of the listings, and therefore falls short of the requirement.  Id.  This argument

misunderstands the regulations.

Colvin is correct that, to meet the epilepsy listing, the record must include "[a]t

least one detailed description of a typical seizure . . . ." 20 C.F.R. § 404, Subpt. P,

App'x 1, § 11.00A (2014).  She is also correct that sections 11.02 and 11.03 both state

that the impairment must be "documented by detailed description[s] of a typical seizure

pattern, including all associated phenomena."  Id.  The regulations do provide a list of

possible phenomena, stating that the "[detailed] description includes the presence or

absence of aura, tongue bites, sphincter control, injuries associated with the attack, and

postictal phenomena."  Id.  Colvin argues that this listing requires each and every one of

these phenomena to be present in order to meet the detailed description requirement.

Def.'s Mem. at 4-5.  The regulation does not bear that interpretation.

First, the list provided in section 11.00A notes that a detailed description of a

seizure "includes" the phenomena that follow.  § 404, Subpt. P, App'x 1. §11.00A.  The

term "includes" does not on its own imply that the phenomena must be included, merely

---

[1] The regulations concerning the epilepsy as a listed impairment were updated recently, including re-labeling 11.02 and 11.03 as 11.02(A) and (B), respectively. 20 C.F.R. § 404, Subpt. P, App'x 1, § 11.02 (2016).  The court will continue to use the labels and definitions from 2014 because those labels and definitions were in effect at the time of the ALJ's Ruling.

that they might be included.  If the regulations intended to mandate that each phenomena must be described, it would have been simple for the Social Security Administration to have used the term "must."  Instead, the regulations chose to leave the term "includes" standing on its own, which the court understands to mean that a detailed description might, but is not required to, include the listed phenomena, so long as the description can be properly described as detailed.

It is also worth noting that the list of phenomena in section 11.00A does not include the length or intensity or bodily location of the seizure.  If the court read the list of phenomena as Colvin requests, a description that included all of the listed phenomena, but did not include the duration or intensity of the seizure could satisfy the detailed description requirement.  The list of phenomena in 11.00A should not be read in such a strained manner, requiring each listed phenomena, but not a description of the seizure itself.  A more expansive reading—one that looks to the listed phenomena as guidance instead of as a checklist—is more natural.

Further, as is often noted, the Social Security Act is a remedial statute, and therefore eligibility for disability coverage should be "broadly construed and liberally applied."  Berg v. Colvin, Civ. No. 3:14-cv-1042, 2016 WL 53823 at * 3 (D. Conn. Jan. 5 2016) (citing Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978)).  A natural reading of this regulation suggests to the reader that the detailed description must include the details of all of the phenomena associated with the claimant's seizure, but not necessarily all of the phenomena in the list provided in 11.00A.  This reading is also more inclusive, and as such fits with the remedial purpose of the Social Security Act.  See id.  Finally, it is reasonable to presume that an otherwise detailed description that

10

merely omits a noticeable phenomenon, such as loss of sphincter control or injury associated with the seizure, reflects the absence of that phenomenon, not the absence of detail in the description.  Thus, the ALJ should have reviewed the record to determine whether there was a detailed description of a typical seizure pattern that includes all of the phenomena associated with the seizures.

In the instant matter, the ALJ summarily disposed of step three with conclusory statements that Nieves does not meet either listing, followed by a recitation of the elements of each listing.  Tr. at 25-26.  Although the ALJ normally "should set forth a sufficient rationale in support of his decision to find or not find a listed impairment," the court can "look to other portions of the ALJ's decision and to credible evidence in finding that his determination was supported by substantial evidence."  Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982).  Here, however, the administrative record and ALJ's decision do not support such a summary rejection of Nieves' claim to a listed impairment.  See White-Swanson v. Colvin, Civ. No. 14-cv-1070, 2016 WL 917945 at *4 (N.D.N.Y Mar. 10, 2016).  For example, the administrative record contains multiple descriptions of Nieves' seizures, including the phenomena of a metallic aura and postictal phenomena of fatigue, amnesia, and confusion.  See, e.g., Tr. at 736. Although these descriptions do not mention tongue bites, sphincter control, or injuries, it is reasonable to assume their absence in the description reflects their absence in fact. Unfortunately, the portion of the ALJ's decision dealing with Nieves' claim of a listed disability is entirely conclusory and provides the court with no understanding of the basis for the ALJ's decision.

11

It is conceivable that the ALJ found Nieves' doctors' descriptions of his seizures to be insufficiently detailed and, for that reason, denied his claim that he had a listed impairment.  If that was the case, the ALJ had an affirmative duty to develop the record in order to determine whether or not such a detailed description could be provided.  See Burgess, 537 F.3d at 128 (describing that, despite the claimant carrying the burden of proving his or her disability, the ALJ has an affirmative duty to develop the record); See also, 20 C.F.R. § 702.338 (Social Security Agency regulations codifying the same).  At the very least, the ALJ could have inquired at the hearing as to whether such a description could be provided and indicated that she would receive it in evidence.  Cf. Tr. at 54 (reading a description of a seizure without asking about any associated phenomena, like tongue biting or loss of sphincter control).  However, because the ALJ did not provide any rationale or reasoning to support her determination that Nieves did not meet either listing of epilepsy, Tr. at 25-26, the court is left without a decision of which to engage in meaningful review.  Therefore, the case must be remanded for the ALJ to engage in a more a thorough step three analysis, including, if necessary, requesting further information from Nieves' doctors.  See 42 U.S.C. § 423(d)(5)(B) (commanding the Commissioner to "make every reasonable effort" to obtain medical evidence from a claimant's treating physician), 42 U.S.C. § 1382c(a)(3)(H)(i) (incorporating the same).  But see, Tankisi, 521 Fed App'x at 33-34 (noting that the ALJ's duty to complete the record is fulfilled when the medical record is extensive).

  2.  The ALJ Failed to Properly Follow the Treating Physician Rule

Additionally, the ALJ did not ascribe any weight to Nieves' treating physicians.  In fact, ALJ Groeneveld-Meijer stated that Nieves' record contains no treating physician's assessment of any work-related limitations due to his epilepsy.  Id. at 27.  This

12

statement is not supported by the record, and therefore the judgment of the ALJ must be reversed and remanded in order for the ALJ to "comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion." Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004).

The regulations governing the determination of disability set out the requirement that the Social Security Agency must evaluate every medical opinion that it receives. 20 C.F.R. § 404.1527(c). Further, the regulations state that the agency generally will give more weight to the opinions of doctors who actually examined the claimant, as well as to treating physicians, who are likely to have a more detailed picture of the claimant's specific impairments. Id. § 404.1527(c)(1)-(2). The regulations require the agency to give the opinion of the treating physician controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case. Id. § 404.1527 (c)(2). "Even if the treating physician's opinion is contradicted by other substantial evidence, and so is not controlling, it may still be entitled to significant weight 'because the treating source is inherently more familiar with a claimant's medical condition than are other sources.'" Tankisi v. Comm'r of Social Sec., 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting Schisler v. Bowen, 851 F.2d 43, 47 (2d Cir. 1988)). In order to determine what weight an opinion of a treating physician that is not given "controlling weight" should receive, the regulations require the ALJ to consider several factors, such as the "[l]ength of the treatment relationship and the frequency of examination"; the "[n]ature and extent of the treatment relationship"; the supportability;

consistency; and the specialization of the physician.  20 C.F.R. § 404.1527 (2)(i)-(ii), (3)-(6).

The regulations explain that the agency "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  Id. § 404.1527(c).  The ALJ's failure to provide these "'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."  Burgess v. Astrue, 537 F.3d 117, 129-30 (2d Cir. 2008) (quoting Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

The lack of a formal statement of a treating source's opinion does not in and of itself make the record incomplete.  Often, a treating physician's view of the claimant's disability can be deduced from the record, including the doctor's notes and other communications regarding the claimant's limitations.  See, e.g., Tanksi, 521 F. App'x at 34 (noting that although the record did not include a formal opinion from Tankisi's treating physician, it was possible to determine the treating physician's opinion of Tankisi's RFC).  In the instant matter, the record is replete with opinions of various physicians who treated Nieves.

For example, in October of 2009, Dr. Quan Hong wrote that Nieves would need to take additional time off, and perhaps miss days of work to recover from his seizures.  Tr. at 537.  On February 9, 2012, Dr. Quan Hong filled out a form that indicated his opinion that Nieves would miss between one and eight days of work per month.  Id. at 695.  Colvin attempts to refute this evidence by claiming that this evidence predates the relevant period because it is before the alleged onset date of August 1, 2012.  Def.'s Mem. at 5-7.  This is not correct.

The statute covering the benefits that Nieves applied for requires the Commissioner to "consider all evidence available in [Nieves;] case record," and to develop a record "of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability."  42 U.S.C. § 423(d)(5)(B); 42 U.S.C. 1382c(a)(3)(H)(i).  However, the ALJ is not limited to the twelve months prior to the application for benefits, but rather is to consider "such information for a longer period if there [is] reason to believe that the information [is] necessary to reach a decision."  DeChirico v. Callahan, 134 F.3d 1177, 1184 (2d Cir. 1998). Dr. Quan Hong had been seeing Nieves for almost a decade when his insurance ended and he transferred treatment to Yale New Haven Hospital.  See Tr. at 279, 692 (two notes from Dr. Quan Hong, the first dated December 3, 2003, and the second dated December 12, 2011).  The last of these was clearly within the twelve months prior to Nieves' alleged onset date of August 1, 2012.  Id. at 692.  The earlier notes appear relevant to the ALJ's decision as to Nieves' RFC.  Thus, Colvin's argument that Dr. Quan Hong's opinion is outside the relevant period is wrong.

Dr. Quan Hong's opinions are clearly that of Nieves' treating physician and describe "specific work-related physical limitations that would preclude the claimant from engaging in substantial gainful activity."  Cf. id. at 27 (the ALJ's finding that there was no opinion of a treating, examining or reviewing physician of record).  As such, the ALJ was entitled to reject these opinion only if she provided "good reasons" for her doing so.  See 20 C.F.R. §404.1527(c).  The vocational expert testified that, if Nieves' epilepsy required him to be off task for greater than ten percent of a workday, or more than two days per month, there would be no work for such an individual.  Id. at 67.

Thus, the ALJ's rejection of Dr. Quan Hong's decision without "good reasons" goes to the heart of Nieves claims, as at least twice, Dr. Quan Hong wrote that he anticipated Nieves to miss work between one and eight times per month. Tr. at 555, 692.

Further, the ALJ's reliance on Dr. Layne was supposedly based on the fact that his opinion was "supported by the clinical and laboratory data . . . and [was] not inconsistent with other significant evidence of record." Id. at 28. This reason is not supported by substantial evidence. Dr. Layne's analysis was that, despite Nieves' alleged epilepsy, Nieves actually suffered from a seizure disorder and multiple sclerosis. Id. at 93. This opinion is in conflict, not only with Nieves' treating physician, id. at 641-645, but also the findings of the ALJ, id. at 23 (detailing how Nieves "treating sources" ultimately attributed the claimant's symptoms to epilepsy). This contradiction is not addressed by the ALJ and undermines her assertion that Dr. Layne's opinion was supported by the evidence of record. Id. at 24. Without any explanation as to why the ALJ did not find Dr. Quan Hong's opinion credible, but did find Dr. Layne credible despite his inconsistencies, the court cannot determine whether or not the ALJ's finding was based on "substantial evidence," and thus must remand for a new hearing so that the ALJ can consider the opinions of Nieves' treating physicians.

## V.    CONCLUSION

Nieves' other three arguments, namely that the ALJ did not consider the severity of his pain, failed to properly determine his RFC, and that Colvin did not meet her burden of proof as to the availability of jobs that Nieves could perform in Connecticut, all turn on whether the ALJ will proceed past step three, and, if she does, what she finds as to the credibility of the opinions of the treating physician as compared to the other doctors. Thus, the court will not address these issues.

16

For the reasons above, Nieves' Motion to Reverse the Decision of the Commissioner (Doc. No. 17) is **GRANTED**.  Colvin's Motion to Affirm the Decision of the Commissioner (Doc. No. 20) is **DENIED**.  The case is remanded to the agency for further proceedings consistent with this Ruling.

**SO ORDERED.**

Dated this 30th day of December, 2016, at New Haven, Connecticut.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge